**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joanna F. Mavris,<br><br>      Plaintiff,<br><br>v.<br><br>RSI Enterprises Incorporated,<br><br>      Defendant. | No. CV-14-01058-PHX-NVW<br><br>**ORDER** |

Before the Court are Defendant's Motion for Summary Judgment, or Alternatively, Summary Adjudication (Doc. 41) and the Response (Doc. 49). For the reasons that follow, the Motion will be denied.

**I. BACKGROUND**

On two occasions in December 2012, Plaintiff received medical treatment at a hospital operated by Scottsdale Healthcare. Doc. 45-1 at 6-7. The hospital created separate billing accounts for these two visits, one ending in 0028 ("0028 account") and the other ending in 0403 ("0403 account"). Doc. 43 at 4. Because Plaintiff was uninsured, she did not pay the hospital at the time of her treatment, and she has not submitted payment since. Doc. 45-1 at 13-14. Scottsdale Healthcare assigned the 0028 account and the 0403 account to Defendant on January 14, 2013, and January 15, 2013, respectively, for servicing. Doc. 44 at 2. The day after receiving each account, Defendant sent Plaintiff a billing invoice on Scottsdale Healthcare letterhead. *Id.* at 2-3. Sometime around late January 2013, Plaintiff applied to Scottsdale Healthcare for

1  "financial aid" in paying down her debts. Doc. 45-1 at 7-8. Scottsdale Healthcare denied
2  these requests in letters dated April 22, 2013, and May 10, 2013. Doc. 44 at 2.
3  Defendant's "collection notes" for the 0028 account show an entry dated March 8, 2013,
4  that reads "CANCELLED-CAN 4062.64"; a May 16, 2013 notation indicates "ACCT
5  REACTIVATED PER NEW BIS FILE." Doc. 44 at 2; 44-1 at 4. The 0403 account's
6  collection notes show similar entries made on March 8, 2013, and April 18, 2013. Doc.
7  44 at 2; Doc. 44-2 at 4.

8  On May 23, 2013, Defendant sent Plaintiff a letter on Scottsdale Healthcare
9  letterhead notifying her that the 0028 and 0403 accounts "remain[ed] unresolved" and
10 requesting that she submit payment to Scottsdale Healthcare. Doc. 44 at 3; Doc. 51-5 at
11 2. A June 20, 2013 letter from Defendant, also on Scottsdale Healthcare letterhead,
12 informed Plaintiff that the two accounts were "now seriously past due." Doc. 44 at 3;
13 Doc. 51-6 at 2. "If this account is not paid in full, or if suitable arrangements for
14 payment have not been made within 30 days," the June 20 letter reads, "this account will
15 be turned over to an outside collection agency for collection." Doc. 51-6 at 2. The letter
16 also states that "THIS IS YOUR FINAL OPPORTUNITY TO RESOLVE YOUR
17 ACCOUNT BEFORE IT IS PLACED WITH A COLLECTION AGNECY." *Id.*
18 (emphasis in original). Both letters are signed "Sincerely, Scottsdale Healthcare"; neither
19 gives any indication that it was sent by Defendant, rather than Scottsdale Healthcare. *See*
20 Doc. 51-5, 51-6. A month later, on July 18, 2013, Defendant sent Plaintiff another letter
21 regarding the 0403 account—this time on its own letterhead—that begins, "Scottsdale
22 Healthcare assigned this balance to [Defendant] for pre-collection efforts … . If payment
23 in full is not received or contact established with Scottsdale Healthcare within 30 days
24 you may be sent to a third-party collections company." Doc. 44 at 3; Doc. 51-7 at 2.
25 Lower down, the letter contains the following warning: "**This communication is from a**
26 **debt collector. This is an attempt to collect a debt. Any information obtained will be**
27 **used for that purpose.**" Doc. 51-7 at 2 (emphasis in original). In two separate
28 locations, the letter instructs Plaintiff to send all payments and correspondence to

1  Scottsdale Healthcare. *Id.* A substantially identical letter concerning account 0028
2  followed on August 15, 2013. *See* Doc. 51-8; Doc. 44 at 3.

3  The next day, Scottsdale Healthcare "recall[ed]" the 0403 account from
4  Defendant, which then "cancelled" the account and "returned" it to Scottsdale
5  Healthcare. Doc. 44 at 3. Defendant's collection notes for this date reflect entries
6  reading "ACCOUNT CANCELLED AND RETURNED FOR BAD DEBT PER DAILY
7  TRANS FILE" and "CANCELLED-CNR 3394.83." Doc. 44-2 at 8. Scottsdale
8  Healthcare declared that account to be in default and two weeks later, on August 30,
9  2013, referred it to West Asset Management, a "third-party debt collector." Doc. 41 at 8;
10 Doc. 43 at 4. After attempting for a month to collect Plaintiff's debt, West Asset
11 Management returned the 0403 account to Scottsdale Healthcare on October 3, 2013.
12 Doc. 43 at 4. Similarly, Scottsdale Healthcare declared the 0028 account to be in default
13 and recalled it from Defendant on September 13, 2013, then referred it to West Asset
14 Management on September 27, 2013. *Id.* On Defendant's collection notes for the 0028
15 account, two September 13, 2013 entries read "ACCOUNT CANCELLED AND
16 RETURNED FOR BAD DEBT PER DAILY TRANS FILE" and "CANCELLED-CNR
17 4062.64." Doc. 44-1 at 7. The account was returned to Scottsdale Healthcare in January
18 2014 after unsuccessful attempts to collect the debt from Plaintiff. Doc. 43 at 4.

19 Plaintiff filed this putative class action on May 16, 2014, seeking statutory and
20 actual damages, on behalf of herself and other members of the proposed class, under the
21 Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. The first of the
22 Complaint's (Doc. 1) three causes of action alleges a violation of 15 U.S.C. § 1692g(b).
23 Under § 1692g(a), "[w]ithin five days after the initial communication with a consumer in
24 connection with the collection of any debt, a debt collector shall" provide the consumer a
25 "written notice" that contains:

26     **(1)** the amount of the debt;
    **(2)** the name of the creditor to whom the debt is owed;
27     **(3)** a statement that unless the consumer, within thirty days after receipt of
    the notice, disputes the validity of the debt, or any portion thereof, the debt
28     will be assumed to be valid by the debt collector;

- 3 -

> **(4)** a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
> **(5)** a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

Section 1692g(b) provides, in turn, that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." According to Plaintiff, Defendant's July 18, 2013 and August 15, 2013 letters—which were written on Defendant's own letterhead and which contain the § 1692g(a) disclosures—were "ineffective and overshadowed and contradicted the statutory notice" in two ways. Doc. 1 at 11. First, those letters "directed Plaintiff to send all correspondence not to Defendant, but to [Scottsdale Healthcare]," notwithstanding the statute's requirement that "all disputes and verification requests must be made to the debt collector, not to a third party, to be effective." *Id.* at 11-12. Second, the letters allegedly demanded payment be made "within 30 days" of the dates they were sent, *id.* at 12, even though the statute permits consumers to inform a debt collector of a dispute "within thirty days *after receipt* of the notice," 15 U.S.C. § 1692g(a)(3) (emphasis added). The Complaint alleges that the "effect of the July 18, 2013 and August 15, 2013 communications was to cause the least-sophisticated consumer to waive, or not assert, the rights afforded under 15 U.S.C. § 1692g." Doc. 1 at 12.

In her second cause of action, Plaintiff alleges Defendant ran afoul of 15 U.S.C. § 1692e(2)(A), which prohibits a "debt collector" from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt," such as the "false representation" of "the character, amount, or legal status of any debt." Defendant allegedly violated this provision in its July 18, 2013 and August 15, 2013 letters when it warned Plaintiff that her account might be sent to a "third-party collections

- 4 -

company" if she did not submit payment within 30 days. Doc. 51-7 at 2. Because Defendant is itself a "debt collections company," Plaintiff argues, those letters misleadingly suggested her accounts had not already been forwarded to a debt collector. Doc. 1 at 13.

Plaintiff's third cause of action piggybacks off of her second. Section 1692e provides a non-exhaustive list of types of conduct that violate the ban on using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Among the proscribed categories of conduct is a catchall prohibiting the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *Id.* § 1692e(10). Plaintiff maintains that "Defendant's July 18, 2013 and August 15, 2013 communications urged Plaintiff to take action before her accounts were sent to a third-party debt collections company, even though her accounts were already placed with Defendant—a third-party collections company." Doc. 1 at 14. The "misleading" nature of these letters allegedly renders them in violation of 15 U.S.C. § 1692e(10). *Id.*

At their August 2014 scheduling conference, the parties agreed to stay discovery on the question of class certification until after resolution of any dispositive motions regarding Plaintiff's individual case. Defendant filed the instant summary judgment motion on November 14, 2014.

II.   **LEGAL STANDARD**

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. At its core it questions whether sufficient evidence exists from which a reasonable jury could find in favor of the party opposing the motion. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A material fact is one that might affect the outcome of the suit under the governing law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

### III.    ANALYSIS

Defendant's sole contention in its Motion is that it is not subject to the FDCPA because, at all times relevant to this action, it did not qualify as a "debt collector" for purposes of the FDCPA. The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Exempted from this definition, however, is "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity … (iii) concerns a debt which was not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F). Defendant argues that because Plaintiff's debt was not "in default" at the time Defendant acquired it, Defendant cannot be classified as a debt collector and is therefore not subject to liability under the FDCPA.

"Although the [FDCPA] does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue." *De Dios v. Int'l Realty & RC Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2011). In other words, "[w]hether a debt is in default is generally controlled by the terms of the contract

creating the indebtedness and applicable state law." *See id.* (quoting Fed. Trade Comm'n, Advisory Op. n.2 (April 25, 1989)) (internal quotation marks omitted). In addition, the FDCPA's "legislative history is consistent with construing 'in default' to mean a debt that is at least delinquent, and sometimes more than overdue." *Id.* at 1075 n.3 (citations omitted).

In this case, both parties agree that no contract between Plaintiff and Scottsdale Healthcare spells out exactly when or under what conditions her debts would go into default. Doc. 41 at 12; Doc. 49 at 14. Arizona law does not appear to provide a clear definition of "in default" or a test for determining when a borrower has defaulted. The Court is therefore left to apply a "case-by-case approach to determining when a debt is 'in default.'" *Natividad v. Wells Fargo Bank, N.A.*, No.: 3:12-cv-03646 JSC, 2013 U.S. Dist. LEXIS 74067, at *13 (N.D. Cal. May 24, 2013) (citing *De Dios*, 641 F.3d at 1075 n.3). In several cases, courts have filled this void by holding that a determination of default turns on "the 'state of mind' of the creditor," i.e., "whether the creditor consider[s] the debt to be in default." *Roberts v. NRA Grp., LLC*, NO. 3:11-2029, 2012 U.S. Dist. LEXIS 113021, at *17 (M.D. Pa. Aug. 10, 2012) (citation omitted). Other courts have adopted a much more expansive reading, finding that, at least in certain circumstances, "default" should be interpreted according to its "dictionary definition"— namely, "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." *Magee v. AllianceOne, Ltd.*, 487 F. Supp. 2d 1024, 1027-28 (S.D. Ind. 2007) (alteration in original) (quoting Black's Law Dictionary (7th ed. 1999)). On this view, a debt could be in default just one day after the borrower misses a payment.

Neither alternative is particularly appealing. Although this case does not present such facts, the former interpretation would in some cases undermine the FDCPA's stated intent to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). "For example, because 15 U.S.C. § 1692a(6)(F)(iii) looks at whether the loan was in default at the time it was 'obtained' by the person involved in the collection activity, and not whether it is in default at the time the collection activity takes place, [a

1 creditor] could [refer] [a borrower's] account to [a third party] for collection one day and
2 declare[] her account to be in default the next, thereby allowing [the third party] to
3 engage in collection practices that are prohibited by the FDCPA (because the loan was
4 not in default when [the third party] 'obtained' it) and at the same time giving [the
5 creditor] the 'rights upon default' afforded it under" a written agreement between the
6 creditor and the borrower.  *Magee*, 487 F. Supp. 2d at 1028.  Conversely, "the FDCPA's
7 broad, pro-debtor objectives would not be served if [courts] adopted [the] argument that
8 default occurs immediately after payment becomes due."  *Alibrandi v. Fin. Outsourcing
9 Servs.*, 333 F.3d 82, 87 (2d Cir. 2003) (per curiam).  That argument would "expos[e]
10 debtors to the sort of adverse measures, such as acceleration, repossession, increased
11 interest rates, and negative reports to credit bureaus, from which the [FDCPA] intended
12 to afford debtors a measure of protection."  *Id.*

13 Fortunately, resolving Defendant's Motion does not require laying down a general
14 rule for when debts are "in default" within the meaning of the FDCPA.  Even adopting
15 the "state of mind" test urged by Defendant, there remains a genuine issue of fact about
16 whether Plaintiff's debts were in default at the time Defendant obtained them.  Defendant
17 has submitted a Declaration (Doc. 43) signed by Jerry Byrd, Scottsdale Healthcare's
18 System Director, who attests that Scottsdale Healthcare sends all of its "self-pay"
19 accounts—those with remaining balances after treatment is complete, Doc. 41 at 6—to
20 Defendant, Doc. 43 at 2.  According to Byrd, Scottsdale Healthcare's accounts remain
21 with Defendant for "approximately 120 days," at which point accounts that "do not
22 warrant additional time" are recalled by Scottsdale Healthcare.  Doc. 43 at 3-4.  It is only
23 at this point that Scottsdale Healthcare declares those accounts to be in default and
24 forwards them to West Asset Management, "a third-party debt collector."  *Id.* at 4.  The
25 "Request for Proposal" by which Scottsdale Healthcare solicited vendors to collect self-
26 pay accounts explains that it "does not include bad debt collections," Doc. 43-1 at 3, an
27 industry term for "[p]ost-default debt," Doc. 43 at 2.  Therefore, Byrd explains, "none of
28 the accounts sent by Scottsdale Healthcare to [Defendant] are in default."  Doc. 43 at 3.

1  In the eyes of Scottsdale Healthcare, Plaintiff's accounts "were not in default at any time
2  while they were being serviced by [Defendant] on behalf of Scottsdale Healthcare." *Id.*
3  at 4.  Defendant's Executive Vice President and Chief Operating Officer, who is partly
4  responsible for maintaining the company's relationship with Scottsdale Healthcare, has
5  also signed a Declaration asserting that Scottsdale Healthcare did not view Plaintiff's
6  accounts as being in default at any time while Defendant was servicing them.  Doc. 46 at
7  2, 3.

8  Nevertheless, Plaintiff attaches a copy of what she describes as Scottsdale Healthcare's "publicly available billing policies," in the form of a document titled "Patient Financial Responsibilities Statement."  Doc. 49 at 14.  The "Nonpayment" section of that document informs potential patients: "If your account is over 90 days past due, you will receive a letter stating that you have 10 days to pay your account in full. … Please be aware that if a balance remains unpaid, we may refer your account to a collection agency."  Doc. 51-10 at 2.  Similarly, a "Financial Policy" form submitted by Plaintiff asks Scottsdale Healthcare patients to sign their name to the following statement: "I understand if my account is not paid in full within 90 days, I may be turned over to a collection agency for further processing."  Doc. 51-11 at 2.  There is no evidence Plaintiff ever received a letter, from either Defendant or Scottsdale Healthcare, giving her 10 days to pay her account in full.  And because neither document bears Plaintiff's signature, it is unclear whether Plaintiff signed similar forms at the time of treatment.  But even if she did not, these documents still suggest that after 90 days, Scottsdale Healthcare may consider unpaid debts to be potentially assignable to a "collection agency"—in other words, "in default."

Defendant argues that because "Scottsdale Healthcare does not send billing invoices on accounts referred to [Defendant]," Doc. 46 at 2, no demand for payment had been made to Plaintiff at the time Defendant obtained her accounts in January 2013. Doc. 41 at 10.  Therefore, the argument goes, those accounts could not possibly have

been in default when acquired by Defendant. Even if this is true,[1] there remains a genuine dispute regarding the date on which Defendant "obtained" Plaintiff's accounts. Both parties appear to agree that Defendant first obtained the accounts in January 2013. But Plaintiff points to Defendant's collection notes to show that the 0403 and 0028 accounts were "cancelled" on March 8, 2013, and not "reactivated" until April 18, 2013, and May 16, 2013, respectively. *See* Doc. 44-1 at 4, Doc. 44-2 at 4. Neither party explains exactly what it means for an account to be cancelled and later reactivated. As a result, it is unclear whether Defendant "re-obtained" the accounts when they were reactivated, or whether those accounts had merely lain in a state of dormancy between cancellation and reactivation. If the former, then the 0403 account was obtained 92 days after Defendant sent Plaintiff its January 16, 2013 billing invoice (and 113 days after Scottsdale Healthcare allegedly requested a $250 deposit), and the 0028 account was obtained 121 days after Defendant sent Plaintiff its January 15, 2013 billing invoice (and 142 days after Scottsdale Healthcare allegedly requested a $250 deposit). Regardless of when the clock started running on Plaintiff's debts, therefore, Defendant obtained them after more than the 90 days that Scottsdale Healthcare's "Patient Financial Responsibilities Statement" and "Financial Policy" suggest may mark the beginning of default.

The evidence Plaintiff presents in her Response—including the Cheek email and Defendant's collection notes—suggests, but does not definitively establish, that Defendant obtained her debts while they were in default. The Court would need more facts to reach a firm conclusion on that question. Regardless, it is Defendant, not Plaintiff, who bears the burden on this summary judgment motion. Defendant has not carried that burden. At the very least, there exists a genuine dispute about whether

---

[1] A June 23, 2014 email sent by Karen Cheek, the System Director for Revenue Cycle Services, suggests Scottsdale Healthcare requested a "$250 deposit" from Plaintiff during both of her hospital visits. Doc. 51-4 at 2. Neither party's brief explains what kind of entity Revenue Cycle Services is or what role it played in this case, and it is unclear to whom the email was addressed. The probative value of this correspondence is therefore limited.

Plaintiff's debts were in default when Defendant obtained them—a fact that is undoubtedly material to determining the extent of Defendant's liability.

In her Response, Plaintiff argues that summary judgment should be denied because Defendant, through its conduct, has waived the right to claim it is not a debt collector. Specifically, Plaintiff contends Defendant is estopped from denying debt-collector status because in its July 18, 2013 and August 15, 2013 letters, Defendant "inform[ed] Plaintiff that [it] is a debt collector, that the purpose of its communications with Plaintiff was to collect a debt, and of her rights under the FDCPA." Doc. 49 at 8. The cases Plaintiff cites indicate there may be some merit to this argument. But deciding the issue is unnecessary to resolving Defendant's Motion. Accordingly, the Court will not consider that argument.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment, or Alternatively, Summary Adjudication (Doc. 41) is denied.

Dated this 16th day of January, 2015.

Neil V. Wake
United States District Judge