**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joanna F. Mavris,<br><br>            Plaintiff,<br><br>v.<br><br>RSI Enterprises Incorporated,<br><br>           Defendant. | No. CV-14-01058-PHX-NVW<br><br>**ORDER** |

Before the Court are Defendant's Motion for Summary Judgment, or Alternatively, Summary Adjudication (Doc. 41), the Response (Doc. 49), and the Reply (Doc. 53). For the reasons that follow, the Motion will be denied.

**I.     BACKGROUND**

On two occasions in December 2012, Plaintiff Joanna F. Mavris received emergency room treatment at a hospital operated by Scottsdale Healthcare. Doc. 45-1 at 6-7. The hospital created separate billing accounts for these two visits, one ending in 0028 ("0028 account") and the other ending in 0403 ("0403 account"). Doc. 41 at 6. Because Mavris was uninsured, she did not pay the hospital at the time of her treatment, and she has not submitted payment since. *Id.* Scottsdale Healthcare assigned the 0028 account and the 0403 account to Defendant RSI Enterprises Incorporated ("RSI") on January 14, 2013, and January 15, 2013, respectively, for collection efforts. Doc. 44 at 2. The day after referring each account, Scottsdale Healthcare sent Mavris a billing invoice on its own letterhead, but prepared by RSI. *Id.* at 2-3. Sometime around late January

2013, Mavris asked Scottsdale Healthcare for financial assistance in paying down her debts. Doc. 45-1 at 7-8. She submitted the requisite paperwork on March 4, 2013, which RSI claims "extend[ed] the time [Mavris] ha[d] to pay [her] account." Doc. 53 at 5; Doc. 43 at 3.[1] Scottsdale Healthcare denied the requests for "financial aid" in letters dated April 22, 2013, and May 10, 2013. Doc. 44 at 2. RSI's "collection notes" for the 0028 account show an entry dated March 8, 2013, that reads "CANCELLED-CAN 4062.64"; a May 16, 2013 notation indicates "ACCT REACTIVATED PER NEW BIS FILE." Doc. 44 at 2; Doc. 44-1 at 4. The 0403 account's collection notes show similar entries made on March 8, 2013, and April 18, 2013. Doc. 44 at 2; Doc. 44-2 at 4.

Mavris received a letter on Scottsdale Healthcare letterhead, dated May 23, 2013, prepared by RSI, notifying her that the 0028 and 0403 accounts "remain[ed] unresolved" and requesting that she submit payment to Scottsdale Healthcare. Doc. 51-5 at 2. A June 20, 2013 letter, also on Scottsdale Healthcare letterhead, informed Mavris that the two accounts were "now seriously past due." Doc. 51-6 at 2. "If this account is not paid in full, or if suitable arrangements for payment have not been made within 30 days," the June 20 letter reads, "this account will be turned over to an outside collection agency for collection." *Id.* The letter also states, "THIS IS YOUR FINAL OPPORTUNITY TO RESOLVE YOUR ACCOUNT BEFORE IT IS PLACED WITH A COLLECTION AGNECY." *Id.* (emphasis in original). Both letters are signed "Sincerely, Scottsdale Healthcare"; neither gives any indication that it was prepared and mailed by RSI, rather than Scottsdale Healthcare. *See* Doc. 51-5, 51-6. A month later, on July 18, 2013, RSI sent Mavris another letter regarding the 0403 account—this time on its own letterhead— that begins, "Scottsdale Healthcare assigned this balance to RSI Enterprises, Inc. for pre-collection efforts … . If payment in full is not received or contact established with Scottsdale Healthcare within 30 days you may be sent to a third-party collections

---

[1] The source for this date, as well as several others cited in the parties' briefing, is an email attached to Mavris' Response (Doc. 51-4), the provenance of which is unclear. Accordingly, this correspondence has only minimal probative value, and it is therefore unclear whether Mavris' accounts remained with RSI immediately following March 4, 2013, and, if they did, how long they lay in a state of dormancy.

- 2 -

company." Doc. 51-7 at 2. Lower down, the letter contains the following warning: "**This communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.**" *Id.* (emphasis in original). In two separate locations, the letter instructs Mavris to send all payments and correspondence to Scottsdale Healthcare. *Id.* A substantially identical letter concerning the 0028 account followed on August 15, 2013. *See* Doc. 51-8.

The next day, Scottsdale Healthcare "recall[ed]" the 0403 account from RSI, which then "cancelled" the account and "returned" it to Scottsdale Healthcare. Doc. 44 at 3. RSI's collection notes for this date reflect entries reading "ACCOUNT CANCELLED AND RETURNED FOR BAD DEBT PER DAILY TRANS FILE" and "CANCELLED-CNR 3394.83." Doc. 44-2 at 8. Scottsdale Healthcare internally deemed that account to be in default and two weeks later, on August 30, 2013, referred it to West Asset Management, a "third-party debt collector." Doc. 41 at 8; Doc. 43 at 4. After attempting for a month to collect Mavris' debt, West Asset Management returned the 0403 account to Scottsdale Healthcare on October 3, 2013. Doc. 43 at 4.

Similarly, Scottsdale Healthcare declared the 0028 account to be in default and recalled it from RSI on September 13, 2013, then referred it to West Asset Management on September 27, 2013. Doc. 43 at 4. On RSI's collection notes for the 0028 account, two September 13, 2013 entries read "ACCOUNT CANCELLED AND RETURNED FOR BAD DEBT PER DAILY TRANS FILE" and "CANCELLED-CNR 4062.64." Doc. 44-1 at 7. The account was returned to Scottsdale Healthcare in January 2014 after unsuccessful attempts to collect the debt from Mavris. Doc. 43 at 4.

Mavris filed this putative class action on May 16, 2014, seeking statutory and actual damages, on behalf of herself and other members of the proposed class, under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. Although the substance of Mavris' claims is not pertinent to this Motion, her allegations provide context helpful to understanding her dispute with RSI. The first of the Complaint's (Doc. 1) three causes of action alleges a violation of 15 U.S.C. § 1692g(b). Under § 1692g(a),

"[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall" provide the consumer a "written notice" that contains:

> **(1)**  the amount of the debt;
> **(2)**  the name of the creditor to whom the debt is owed;
> **(3)**  a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
> **(4)**  a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
> **(5)**  a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

Section 1692g(b) provides, in turn, that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor."

According to Mavris, RSI's July 18, 2013 and August 15, 2013 letters—which were written on RSI's own letterhead and which contain the § 1692g(a) disclosures— were "ineffective and overshadowed and contradicted the statutory notice" in two ways. Doc. 1 at 11.  First, those letters "directed [Mavris] to send all correspondence not to [RSI], but to [Scottsdale Healthcare]," notwithstanding the statute's requirement that "all disputes and verification requests must be made to the debt collector, not to a third party, to be effective."  *Id.* at 11-12.  Second, the letters allegedly demanded payment be made "within 30 days" of the dates they were sent, *id.* at 12, even though the statute permits consumers to inform a debt collector of a dispute "within thirty days *after receipt* of the notice," 15 U.S.C. § 1692g(a)(3) (emphasis added).  The Complaint alleges that the

- 4 -

"effect of the July 18, 2013 and August 15, 2013 communications was to cause the least-sophisticated consumer to waive, or not assert, the rights afforded under 15 U.S.C. § 1692g." Doc. 1 at 12.

In her second cause of action, Mavris alleges RSI ran afoul of 15 U.S.C. § 1692e(2)(A), which prohibits a "debt collector" from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt," such as the "false representation" of "the character, amount, or legal status of any debt." RSI allegedly violated this provision in its July 18, 2013 and August 15, 2013 letters when it warned Mavris that her account might be sent to a "third-party collections company" if she did not submit payment within thirty days. *E.g.*, Doc. 51-7 at 2. Because RSI is itself a "debt collections company," Mavris argues, those letters misleadingly suggested her accounts had not already been forwarded to a debt collector. Doc. 1 at 13.

Mavris' third cause of action piggybacks off of her second. Section 1692e provides a non-exhaustive list of types of conduct that violate the ban on using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Among the proscribed categories of conduct is a catchall prohibiting the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *Id.* § 1692e(10). Mavris maintains that "[RSI's] July 18, 2013 and August 15, 2013 communications urged [Mavris] to take action before her accounts were sent to a third-party debt collections company, even though her accounts were already placed with [RSI]—a third-party collections company." Doc. 1 at 14. The "misleading" nature of these letters allegedly renders them in violation of 15 U.S.C. § 1692e(10). *Id.*

At their August 2014 scheduling conference, the parties agreed to stay discovery on the question of class certification until after resolution of any dispositive motions regarding Mavris' individual case. RSI filed the instant summary judgment motion on November 14, 2014.

**II.   LEGAL STANDARD**

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. At its core it questions whether sufficient evidence exists from which a reasonable jury could find in favor of the party opposing the motion. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A material fact is one that might affect the outcome of the suit under the governing law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

**III.   ANALYSIS**

RSI's sole contention in its Motion is that it is not subject to the FDCPA because, at all times relevant to this action, it did not qualify as a "debt collector" for purposes of the FDCPA. The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Exempted from this definition, however, is "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the

- 6 -

extent such activity … (iii) concerns a debt which was not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F)(iii).[2] RSI argues that Mavris' debt was not "in default" at the time RSI acquired it, and therefore RSI is not a debt collector and not subject to liability under the FDCPA.

"Although the [FDCPA] does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue." *De Dios v. Int'l Realty & RC Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2011). In other words, "[w]hether a debt is in default is generally controlled by the terms of the contract creating the indebtedness and applicable state law." *Id.* (quoting, in parenthetical, Fed. Trade Comm'n, Advisory Op. n.2 (April 25, 1989)) (internal quotation marks omitted). In addition, the FDCPA's "legislative history is consistent with construing 'in default' to mean a debt that is at least delinquent, and sometimes more than overdue." *Id.* at 1075 n.3 (citations omitted).

In this case, both parties agree that no contract between Mavris and Scottsdale Healthcare spells out exactly when or under what conditions her debts would go into default. Doc. 41 at 12; Doc. 49 at 14. Arizona law does not appear to provide a clear definition of "in default" or a test for determining when a debtor has defaulted. The Court is therefore left to apply a "case-by-case approach to determining when a debt is 'in default.'" *Natividad v. Wells Fargo Bank, N.A.*, No.: 3:12-cv-03646 JSC, 2013 U.S. Dist. LEXIS 74067, at *13 (N.D. Cal. May 24, 2013) (citing *De Dios*, 641 F.3d at 1075 n.3). In several cases, courts have filled this void by holding that a determination of default turns on "the 'state of mind' of the creditor," i.e., whether the creditor considers the debt to be in default or not. *Roberts v. NRA Grp., LLC*, NO. 3:11-2029, 2012 U.S. Dist. LEXIS 113021, at *17 (M.D. Pa. Aug. 10, 2012). Other courts have adopted a much more expansive reading, finding that, at least in certain circumstances, "default"

---

[2] This exemption places the factoring of accounts receivable outside the scope of the FDCPA, thereby leaving a factor in the same position as the original creditor, had the creditor not sold his accounts receivable to the factor. By excusing factors from compliance with these regulations, the FDCPA respects a common method of business financing.

- 7 -

should be interpreted according to its "dictionary definition"—namely, "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." *Magee v. AllianceOne, Ltd.*, 487 F. Supp. 2d 1024, 1027-28 (S.D. Ind. 2007) (alteration in original) (quoting Black's Law Dictionary (7th ed. 1999)). On this view, a debt could be in default just one day after the debtor misses a payment.

Neither alternative is particularly appealing. Although this case does not present such facts, the former interpretation would in some cases undermine the FDCPA's stated intent to "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). "For example, because 15 U.S.C. § 1692a(6)(F)(iii) looks at whether the loan was in default at the time it was 'obtained' by the person involved in the collection activity, and not whether it is in default at the time the collection activity takes place, [a creditor] could [refer] [a debtor's] account to [a third party] for collection one day and declare[] her account to be in default the next, thereby allowing [the third party] to engage in collection practices that are prohibited by the FDCPA (because the loan was not in default when [the third party] 'obtained' it) and at the same time giving [the creditor] the 'rights upon default' afforded it under" a written agreement between the creditor and the debtor. *Magee*, 487 F. Supp. 2d at 1028. Conversely, "the FDCPA's broad, pro-debtor objectives would not be served if [courts] adopted [the] argument that default occurs immediately after payment becomes due." *Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82, 87 (2d Cir. 2003) (per curiam). That argument would "expos[e] debtors to the sort of adverse measures, such as acceleration, repossession, increased interest rates, and negative reports to credit bureaus, from which the [FDCPA] intended to afford debtors a measure of protection." *Id.* At oral argument, counsel for Mavris disclaimed reliance on this counterintuitive "day one" theory.

Fortunately, the Ninth Circuit's resolution of a related textual ambiguity in the FDCPA points toward a third option. "The FDCPA precludes debt collectors from implementing unlawful debt collection tactics against consumers. Consequently, the [FDCPA] applies to consumer debts and not business loans." *Slenk v. Transworld Sys.*,

236 F.3d 1072, 1074 (9th Cir. 2001) (alteration in original) (citation and internal quotation marks omitted). "The FDCPA defines a consumer debt as, 'any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the . . . property . . . which [is] the subject of the transaction [is] primarily for personal, family, or household purposes.'" *Id.* (alterations in original) (quoting 15 U.S.C. § 1692a(5)). But the FDCPA offers no guidance on precisely which purposes are of a "personal, family, or household" nature. In many cases, the proper classification is obvious. In others, however, uncertain or conflicting facts can pull in opposite directions. *See, e.g.*, *Smith v. Progressive Fin. Servs.*, Civ. No. 6:12-cv-1704-MC, 2013 U.S. Dist. LEXIS 108744, at *4-10 (D. Or. Aug. 1, 2013) (determining plaintiff's debt, incurred to finance education at flight school, was personal in nature, even though degree or certificate could allow her to enter the field of aviation "in pursuit of profit").

Instead of laying down a bright-line rule about when debts are made for personal, family or household reasons, the Ninth Circuit plugged this gap by adopting a functional, all-things-considered analysis. "We have found it necessary when classifying a loan," the court wrote in *Slenk*, "to examine the transaction as a whole, paying particular attention to the purpose for which the credit was extended in order to determine whether [the] transaction was primarily consumer or commercial in nature. In making this determination, we have elevated substance over form, holding that neither the lender's motives nor the fashion in which the loan is memorialized are dispositive of this inquiry. We must therefore look to the substance of the transaction and the borrower's purpose in obtaining the loan, rather than the form alone." 236 F.3d at 1075 (alteration in original) (citations and internal quotation marks omitted).

Though not directly analogous to the "in default" inquiry, the *Slenk* consumer-commercial framework provides a useful model for resolving RSI's Motion. Here, rather than the purpose for which the credit was extended, the guiding principle of the analysis would be the status of the debt, viewed objectively in light of all the circumstances. That is, at the time a third party obtains a debt for collection, would a reasonable person in the

- 9 -

debtor's position believe that the creditor viewed the debt as being in default? Like the *Slenk* approach, this framework would balance a variety of different factors, none of which would necessarily be dispositive in a given case. The relevant factors might include the number of times a creditor has requested payment, the time that has elapsed since the first request, the urgency of the language used in those requests, the debtor's knowledge that she has been referred to a third party, the creditor's internal policies, any representations made by or on behalf of the creditor—either publicly or to a specific debtor—about how it collects debts, and apparent attempts by the creditor or third party to circumvent the FDCPA's consumer protections. This list is not exhaustive; it necessarily captures only a subset of the factors that could impact objective perceptions of default in any given case.

This balancing approach is not without its weaknesses. For one, it fails to provide the certainty and predictability that would enable creditors and collection agencies to run close to the line in complying with their legal obligations. Nor does it ensure, in every case, that debtors will know when they have redress for abusive debt collection practices. Different sets of facts will lend themselves to different analyses, with some factors receiving more or less weight than they might under other circumstances. But this risk is inherent in any balancing test or "reasonableness" standard, both of which are common features of American law. More important, the functional, multi-factor test outlined above better serves the broad purpose of the FDCPA—i.e., "to protect vulnerable and unsophisticated debtors from abuse, harassment, and deceptive collection practices," *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 938 (9th Cir. 2007) (per curiam) (citations omitted)—than RSI's alternative that a debt is in default when the creditor says so. Referring a debt to a debt collector heightens the potential for abuse, and a debtor's ability to protect herself from that abuse must turn on something more than a creditor's decision—made according to rules or criteria of which the debtor may have no knowledge—to declare a debt in default. The FDCPA's statutory protections would be of little value if a debtor, unable to rely on statements ostensibly made by the creditor, had

1   to guess at whether the creditor had privately declared her debt in default. Just as the
2   lender's "motives" are not "dispositive" of whether a debt is consumer or commercial in
3   nature, *see Slenk*, 236 F.3d at 1075, the lender's subjective choice that the debtor has not
4   defaulted cannot be dispositive of whether default has in fact occurred. If it were,
5   debtors' access to FDCPA protections would be subject to the whim of creditors, who
6   could leave debtors completely in the dark about when, if ever, those protections
7   commence. Objective indicia of a creditor's treatment of a debt are entitled to greater
8   weight.

9   The balancing approach also suffers from a related, more fundamental flaw. Just
10  as a debtor cannot know whether a creditor considers a debt in default unless informed by
11  the creditor, she also cannot know when a creditor has transferred a debt to a third party
12  unless informed by either the creditor or the third party. In other words, even if a debtor
13  has reasonable grounds to believe a creditor views a debt as in default, she will be unable
14  to assert her FDCPA rights unless she also knows that 1) the creditor has transferred the
15  debt to a third party, and 2) that transfer occurred *after* the creditor began treating the
16  debt as in default. But unless the creditor or third party informs the debtor of the date of
17  the transfer—which does not appear to be statutorily required—the debtor may be unable
18  to obtain the necessary information. As a result, a creditor can manipulate the FDCPA's
19  definition of "debt collector" so as to free debt-collection efforts from the FDCPA's
20  numerous pro-debtor provisions. For example, if a creditor transfers a debt, nominally
21  but not in economic substance, to a third party on the day after payment becomes due—
22  that is, before a reasonable debtor could believe that the creditor views the debt as in
23  default—that third party would be free to seek payment from the debtor without abiding
24  by the anti-abuse and anti-harassment rules imposed by the FDCPA.

25  The balancing test described above does nothing to prevent such abuses. But
26  neither do RSI's "state of mind" approach or any other judicially sanctioned approach of
27  which the Court is aware. Perhaps for this reason, the Federal Trade Commission, in "its
28  March 2001 annual report on the FDCPA, … formally recommended that Congress

1 amend § 1692a(6)(F)(iii) 'so that its applicability will depend upon the nature of the overall business conducted by the party to be exempted rather than the status of individual obligations when the party obtained them.'" *Alibrandi*, 333 F.3d at 86 (citation omitted).  But the statute remains unchanged, and until Congress amends the FDCPA, the *Slenk*-like balancing analysis appears to be the most prudent way of determining whether a debt is in default.  Unlike the "state of mind" or "day one" frameworks, the balancing analysis allows for broad and contextual consideration of the circumstances in a manner that promotes the FDCPA's stated goal of "eliminat[ing] abusive debt collection practices by debt collectors" and "insur[ing] that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."  15 U.S.C. § 1692(e).

The Court need not sketch out the precise contours or boundaries of that analysis.  Although there may be future cases in which the malleability of the balancing analysis becomes problematic, this case presents facts that render application of the analysis straightforward.

RSI devotes most of its briefing to proving Scottsdale Healthcare did not consider Mavris' debts to be in default at the time RSI obtained them.  RSI has submitted a Declaration (Doc. 43) signed by Jerry Byrd, Scottsdale Healthcare's System Director for Medicare and Government Payers and Billing, who attests that Scottsdale Healthcare sends all of its "self-pay" accounts—those with remaining balances after treatment is complete—to RSI.  Doc. 43 at 2-3.  According to Byrd, Scottsdale Healthcare's accounts remain with RSI for "approximately 120 days," at which point accounts that "do not warrant additional time" are recalled by Scottsdale Healthcare.  *Id.* at 3-4.  It is only at this point that Scottsdale Healthcare declares those accounts to be in default and forwards them to West Asset Management, "a third-party debt collector."  *Id.* at 4.  But when a patient submits an application for financial assistance, as Mavris did, that patient "will be given additional time before declaring the account in default."  *Id.* at 3.  Therefore, Byrd explains, in the eyes of Scottsdale Healthcare, Mavris' accounts "were not in default at

any time while they were being serviced by RSI." *Id.* at 4. RSI's Executive Vice President and Chief Operating Officer, who is partly responsible for maintaining the company's relationship with Scottsdale Healthcare, has also signed a Declaration (Doc. 46) asserting that Scottsdale Healthcare did not view Mavris' accounts as being in default when RSI obtained them. Doc. 46 at 2-3.

Nevertheless, Mavris attaches a copy of what she describes as Scottsdale Healthcare's "publicly available billing policies," in the form of a document titled "Patient Financial Responsibilities Statement." Doc. 49 at 14. The "Nonpayment" section of that document informs potential patients: "If your account is over 90 days past due, you will receive a letter stating that you have 10 days to pay your account in full. … Please be aware that if a balance remains unpaid, we may refer your account to a collection agency." Doc. 51-10 at 2. Similarly, a "Financial Policy" form submitted by Mavris asks Scottsdale Healthcare patients to sign their name to the following statement: "I understand if my account is not paid in full within 90 days, I may be turned over to a collection agency for further processing." Doc. 51-11 at 2. These documents suggest that after ninety days, Scottsdale Healthcare may consider unpaid debts to be potentially assignable to a "collection agency"—in other words, "in default." In its Reply, RSI disputes the relevance of these policies on the grounds that Mavris, who "was admitted to Scottsdale Healthcare's emergency room," obtained "both policies from Scottsdale Healthcare's primary care medical providers" and has "offer[ed] no evidence that Scottsdale Healthcare's primary care financial policies have any application to her ER treatment." Doc. 53 at 5 (emphasis in original). At oral argument, counsel for RSI conceded that he could not state definitively that the policies do not apply to emergency room treatment. He also conceded that Scottsdale Healthcare's 120-day policy is a "general guideline," not a hard and fast rule, and that it is "fluid" but "not entirely subjective."

Even if the "Patient Financial Responsibilities Statement" and "Financial Policy" do apply to emergency room care, RSI argues, Mavris' March 4, 2013 request for

- 13 -

financial assistance tolled the default period, with the result that fewer than ninety days had passed when Scottsdale Healthcare "reassigned" Mavris' accounts to RSI in April and May 2013. RSI further argues that because "Scottsdale Healthcare does not send billing invoices on accounts referred to RSI," *see* Doc. 46 at 2, no demand for payment had been made to Mavris at the time RSI obtained her accounts in January 2013. Doc. 41 at 10. Therefore, the argument goes, those accounts could not possibly have been in default when acquired by RSI.

Deciding this knotty factual issue is unnecessary to resolving RSI's Motion. As explained above, a creditor's "state of mind" is not wholly irrelevant to determining whether a debt is in default, but it is far from the most important consideration. Significantly more relevant are objective indicators of the debt's status, as of the date it was obtained by a third party. In this case, those indicators decisively establish that RSI and Scottsdale Healthcare deliberately attempted to lead Mavris into believing her accounts were in default.

Acting through RSI, Scottsdale Healthcare sent Mavris a letter on the hospital's letterhead, dated June 20, 2013, warning her that her accounts would "be turned over to an outside collection agency for collection" if she did not make payment within thirty days. Doc. 51-6 at 2. On July 18, 2013, almost exactly thirty days later, RSI sent another letter—this time on its own letterhead—that informed Mavris "Scottsdale Healthcare [had] assigned [her] balance to RSI Enterprises, Inc. for pre-collection efforts" on the 0403 account. Doc. 51-7 at 2. That letter requested payment and proclaimed, in bold writing, "**This communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.**" *Id.* (emphasis in original). In addition, the letter included the disclosures mandated by § 1692g(a), which explain to debtors their right to dispute the validity of a debt. *See id.* While this latter fact may not by itself render RSI a debt collector for FDCPA purposes, *see Stamper v. Wilson & Assocs., P.L.L.C.*, No. 3:09-cv-270, 2010 U.S. Dist. LEXIS 31770, at *23 (E.D. Tenn. Mar. 31, 2010) ("The fact that FDCPA disclaimers were sent in connection with a

non-judicial foreclosure proceeding does not automatically transform the defendants into 'debt collectors.'"), it provides a further basis on which a reasonable, objective person could conclude that Scottsdale Healthcare was treating Mavris' debt as being in default.

In fact, counsel for RSI admitted during oral argument that the purpose of the June and July letters was to "scare" or "motivate" Mavris into making prompt payment. By creating the impression that Scottsdale Healthcare had stepped up its collection efforts through resort to an outside party, the letters attempted to encourage payment before that outside party began using potentially more heavy-handed tactics. The fact that the July 18 letter threatens to send Mavris "to a third-party collections company" if "payment in full is not received … within 30 days," Doc. 51-7 at 2, does not undermine the conclusion that the two letters were intended to create the appearance of referral. Under the *Slenk*-like balancing analysis, the June and July letters would have fully justified Mavris in believing that Scottsdale Healthcare considered her accounts to be in default at the time it claimed to transfer them to RSI.

RSI's counsel acknowledged at oral argument that Scottsdale Healthcare's "assignment" of Mavris' accounts to RSI was without economic substance. Scottsdale Healthcare retained ownership of the accounts at all times, and RSI was paid to act as an agent, in much the same way the hospital might pay one of its own employees if it handled bill collection internally. RSI acted at the request, and under the control, of Scottsdale Healthcare. For purposes of determining when RSI "obtained" Mavris' accounts from Scottsdale Healthcare, the distinction between the two entities was more theoretical than substantive. On the facts of this case, it would therefore be inequitable—and at cross-purposes with the FDCPA—to permit RSI to deny debt-collector status on the grounds that it obtained Mavris' accounts in January 2013. A third party will not necessarily fail to "obtain" a debt every time a transfer from the creditor is without economic substance, as was the case here. Indeed, many courts treat such transfers as marking the date on which a debt is "obtained." *See, e.g.*, *Alibrandi*, 333 F.3d at 83-84, 87-88 (assuming third party had obtained debt where debt could eventually be "recalled"

by creditor and all communications with debtor had to be "preapproved" by creditor). But where, as here, a creditor and third party have intentionally misled a debtor into believing a debt will be transferred because of default, the third party cannot evade its FDCPA obligations by pointing to a previous, undisclosed transfer that supposedly defeats its plain representations to the debtor.

Other factors also weigh in favor of finding that Mavris' debts were in default. Even if, as RSI contends, no demand for payment was made before mid-January 2013, over six months had passed by the time Mavris received RSI's July 18 letter. In that time, Mavris had received two other letters demanding payment, one of which described her accounts as "now seriously past due." Doc. 51-6 at 2. Scottsdale Healthcare may well have viewed Mavris' accounts as being "on hold" for up to two months of that period, but if it did, RSI has produced no evidence that that information was communicated to Mavris. And even if Mavris was aware of Scottsdale Healthcare's expectations, her accounts were "reactivated" more than two months before she received the July 18 letter. In light of these facts, the most sensible way to interpret that letter is as a notification that Scottsdale Healthcare considered Mavris' accounts to be in default.

At trial, RSI is free to argue that it does not qualify as a debt collector because Mavris' debts were not "in default" at the time RSI obtained them. The evidence suggests RSI is unlikely to prevail on that theory. But at the very least, RSI has failed to show the absence of a genuine dispute regarding its debt-collector status.

IT IS THEREFORE ORDERED that Defendant RSI Enterprises, Inc.'s Motion for Summary Judgment, or Alternatively, Summary Adjudication (Doc. 41) is denied.

Dated this 19th day of February, 2015.

Neil V. Wake
United States District Judge

- 16 -